**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: S1 1:13-CR-834-PKC |
| | ) | |
| ALEX YUCEL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SENTENCING MEMORANDUM
## ON BEHALF OF ALEX YUCEL

Through counsel, Alex Yucel ("Mr. Yucel") files the following Sentencing Memorandum setting forth all factors the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

In this case, the Sentencing Guidelines recommend a range of imprisonment of 70-87 months.  Mr. Yucel submits this Sentencing Memorandum in an attempt to educate the Court about his life, his family, and the circumstances that have brought him to this sentencing. Mr. Yucel requests that this Court consider all of the factors contained herein and fashion a sentence that is sufficient, but not greater than necessary, to accomplish the stated objectives of sentencing found in 18 U.S.C. 3553(a).

United States Supreme Court Justice Anthony Kennedy has stated that, "our resources are misspent, our punishments too severe, our sentences too long."[1]  It is incumbent on this Court to,

---

1 Justice Anthony Kennedy, Speech at the American Bar Association Annual Meeting (August 9, 2003) available at http://74.125.47.132/search?q=cache:RaV8HeXt5s0J:www.supremecourtus.gov/publicinfo/speeches/sp_08-09-03.html+Justice+Anthony+Kennedy,+American+Bar+Association+meeting,+August+9,+2003&cd=1&hl=en&ct=clnk&gl=us

"consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518, U.S. 81, 113 (1996).

Mr. Yucel suggests a sentence of 30 months is sufficient.

## APPLICATION OF THE STATUTORY SENTENCING FACTORS TO THIS CASE

In the present case, the following statutory factors must be considered when determining what type and length of sentence is "sufficient, but not greater than necessary," to satisfy the purposes of sentencing:

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

**(a) Nature and Circumstances of Offense**

Mr. Yucel plead guilty to Count 2 of the Superseding Indictment.  Mr. Yucel originally created Blackshades software as an ongoing project for his school activities.  Its purpose was to provide a training platform for computer science students interested in remote access tools, cyber-security and risk management.  Many, if not all, of the features in Blackshades may be found in commercial remote access tools lawfully for sale around the world.  Keyloggers, RATs, Ddos and other features contained within the Blackshades program can be found on many programs available for purchase by the public.  These features may be used to perform perfectly legal activities including allowing IT professionals to access employee computers remotely, recover passwords or other information, and test internal networks for stress capacity.  In fact, some of the vendors and payment portals used by Blackshades put the program through rigorous testing to make sure that it could be used for legitimate lawful purposes, and was not considered "malware" per se.  This is not to say that Mr. Yucel is stepping away from his acceptance of

2

responsibility for his actions.  The point is that Mr. Yucel is not a malicious individual who created a worm, virus or other purely destructive program.  Mr. Yucel acknowledges; however, that there were instances of misuse and abuse of the Blackshades program as admitted at his plea.

Another issue presented in this case it that once Blackshades was created multiple cracked versions began appearing on the internet.  These versions were reconfigured, had various capabilities and were spread without any involvement or knowledge by Mr. Yucel.  Thus the prevalence of the program was not because of Mr. Yucel or his contacts, but more dramatically by the multitude of cracked version available on the internet.

Ultimately, Mr. Yucel regrets the decisions he made, has learned a significant lesson and intends to go back to Sweden to attempt to salvage his life.  His intentions immediately are to reunite with his family and fiancé, get married, and return to school to further his education in hopes of a career in the near future.  While some measure of punishment is warranted and expected, Mr. Yucel is young, intelligent and in a prime position to return to the community as a productive law-abiding individual.  A sentence of 30 months accounts for the seriousness of the offense.

**(b) History and Characteristics of Mr. Yucel**

Mr. Yucel stands before this Court a broken man.  Mr. Yucel has been ripped out of the life he once knew and shoved into the realities of the American criminal justice system.  It is difficult to understand the swiftness and severity of federal criminal law, but that is especially true to a young man from Sweden who is unaccustomed to such harsh conditions and punishments.  In fact, in Sweden the incarceration rate is 66 out of 100,000 people (one of the

lowest rates of incarceration in the world), compared to the U.S. rate of 707 to 100,000.



*The Washington Post,* "The Meteoric, Costly and Unprecedented Rise of Incarceration in America," Emily Badger, April 30, 2014.

"A penal Exceptionalism of all Scandinavian countries dwells upon two key features: low rates of imprisonment and humane prison conditions. Its roots are set in highly egalitarian cultural values and social structures of these countries, which was institutionalized and embedded in their social milieu thanks to the development of the Scandinavian welfare state."

*Imprisonment In Sweden – Normative Frameworks, Characteristics And Impact On Recidivism*, Institute of Criminological and Sociological Research, Belgrade,  Ana Batricevic1 Ljeposava Ilijic, Available at: http://www.kpa.edu.rs/cms/data/akademija/nbp/NBP_2013_2.pdf#page=143. "Accordingly, Nordic offenders are not stripped of their basic rights and their independence is restricted only while they receive rehabilitation services that are intended to deter them from future criminal activity."  *Id.*  In spite of the increase in the number of reported criminal offences

since 1960s, relatively low rate of all forms of crime and low recidivism rate still represent a characteristic of Scandinavian legal systems. *Id*.

In Scandinavian countries, the purpose of punishment is based upon the attitude that punishments that include the deprivation of liberty are supposed to be imposed as ultima ratio and avoided as much as it is possible, since the application of re-socialization programs and treatments that are conducted outside the penitentiary institutions are considered more "natural" and appropriate. *Id*. Even if imposing prison sentence appears to be necessary, it is recognized that going to prison is itself the punishment for crime, which means that prison conditions can then approximate to life outside as far as possible, rather than being allowed to degrade and debase all within. *Id*.

 One might imagine that the deterrent effect would be especially potent for Mr. Yucel. To date, he has spent approximately 13 months in custody in the United States and approximately one month while in Moldova. When this ordeal began for Mr. Yucel he was living in Moldova with his Fiancé. By all accounts, and in my personal experience, Mr. Yucel is a hard-working, average young man. He had a normal childhood, remains close with his family, had success in athletics and learned computers through predominantly self-education. He has experienced the ups and downs of an average lifestyle.

In addition, Mr. Yucel has scored a category I criminal history. That criminal history category is a result of zero criminal history points. Mr. Yucel is drug free and has never suffered from any addiction to illegal drugs or alcohol. He is in good health, is educated, and has marketable skills. Thus, Mr. Yucel's understanding of the criminal system was nonexistent.

As a result, Mr. Yucel has dealt with bouts of depression and anxiety. This was only aggravated by his experience during his removal from Moldova to the United States in the

middle of the night while hooded.   The U.N. has even determined that his rights were violated by removing him prior to all avenues of appeal were extinguished.  To compound the issue, Mr. Yucel's mother has been ill for some time, but his family has shielded him from the true nature of the illness.  Those circumstances have increased the severity of the punishment heaped on him even before he is sentenced in this case.

To his credit, Mr. Yucel has started the process of overcoming his current predicament. He has taken the opportunity to spend his time in MCC productively.  He has completed life skills courses and is an active participant in the limited activities in which he can participate. Mr. Yucel has also helped his fellow detainees by coaching them in chess.  He has maintained contact, though very limited, with his family and fiancé.  Putting Mr. Yucel in custody for an extended period would cause hardship on his family, and interrupt the positive progress Mr. Yucel has made.

The remorse Mr. Yucel exudes is palpable.  He is a model of reform and there is little doubt that he will follow the letter of the law in the future.  This incident is certainly an aberration is his years of upstanding conduct.  Mr. Yucel became involved in this offense and admits his conduct, but it has done nothing but hurt him physically, emotionally and spiritually. More importantly to Mr. Yucel, he has hurt his family.

Mr. Yucel should be judged on the whole of his life, not just the poor decisions he made as a young man. Mr. Yucel's character and impact on those who know him is clearly demonstrated in the letters submitted on his behalf.  They provide a glimpse into the true nature of Mr. Yucel.  Judge Rakoff of the says:

> [S]urely if every man is to receive credit for the good he
> has done, and his immediate misconduct assessed in the
> context of his overall life hitherto, it should be at the
> moment of his sentencing, when his very future hangs in

> the balance.  This elementary principle of weighing the
> good with the bad, which is basic to all great religions,
> moral philosophies, and systems of justice, was plainly part
> of what Congress had in mind when it directed the Courts
> to consider, as a necessary sentencing factor, "the history
> and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp. 2d 506, 513-14 (S.D.N.Y. 2006).  Based on that, Mr.

Yucel's good far outweighs the bad.  As further explained below, the sentencing factors found in

3553(a) weigh in favor of a 30 month sentence.

2.      **The Need for the Sentence Imposed To Promote Certain Statutory Objectives**:

        **(A) to reflect the seriousness of the offense, promote respect for the law, and provide
        just punishment for the offense**

        Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence imposed .

. . to reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense." A sentence that is excessive in light of the seriousness of the

offense promotes disrespect for law and provides unjust punishment. The purposes set forth in §

3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as

follows:

> First, retributive, or "just deserts," theory considers only the defendant's past
> actions, not his or her probable future conduct or the effect that the punishment
> might have on crime rates or otherwise. Second, retribution examines the actor's
> degree of blameworthiness for his or her past actions, focusing on the offense
> being sentenced. . . . Third, the degree of blameworthiness of an offense is
> generally assessed according to two kinds of elements: the nature and seriousness
> of the harm caused or threatened by the crime; and the offender's degree of
> culpability in committing the crime, in particular, his degree of intent (mens rea),
> motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth

Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February

2005).  Based on these factors, the Court must balance the seriousness of the offense with the need to provide just punishment and promote respect for the law.

Mr. Yucel's degree blameworthiness is diminished by the fact that he:

1. Entered a plea to the charge in a timely manner; and

2. Spent time in custody productively attending life skills courses and coaching others in chess.

Judges must consider *all* of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" permit or encourage only prison. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 602 & n.11 (2007).  The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*.  18 U.S.C. § 3582(a) (emphasis added).

The Supreme Court in *Gall*, 552 U.S. 38, 128 S. Ct. 586, 595-96 & n.4 (2007), that in some cases, "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" *Id.* at 599 (quoting district court opinion).

Catherine McVey, Chairman of the Pennsylvania Board of Probation and parole, echoes the reasoning in *Gall,* saying:

So the issues for us are: Who should we incarcerate? How many people should we incarcerate? For how long should we incarcerate them? And when we think about that, we want to think about what are the objectives of incarceration? The alternative to incarceration is in part an outgrowth of our focus on outcomes. As we focus on

outcomes, the emphasis begins to recede from an issue of pure punishment objective, and we begin to then transition to the thoughts of what works to change offender behavior.

*Proceedings from the Symposium on Alternatives to Incarceration* at 10 (July 14-15, 2008), *available at* http://www.ussc.gov/SYMPO2008/Material/02_FINAL_Overview %20of%20Alternative%20SentencingOptions.pdf

A 70 month term of imprisonment in this case is overly punitive and will do nothing to accomplish the true goals of sentencing.  The true hope of sentencing is to adequately punish an individual, while maintaining or enhancing their ability to be a law-abiding citizen, maintain employment, maintain family ties, and avoid recidivism.

A sentence of 30 months reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

**(B) to afford adequate deterrence to criminal conduct**

Specific and general deterrence is a specific component of most sentences.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

General deterrence is based, in part, on creating or enhancing a particular individual's sentence based on the prospect, entirely speculative and inchoate, of influencing some unknown

future wrongdoer who has not committed, or perhaps even contemplated, a crime.  A person should receive the sentence *they* deserve, without significant consideration for what some other future, unknown person may deserve.  *See* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment*?, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending is *just that* – an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances ") (emphasis in original).

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* At 2. The report concluded, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* At 1.

Similarly, an extensive report issued earlier this year by the Brennan Center for Justice (at New York University School of Law) concluded that, controlling for other variables, incarceration rates have increased to such an extent in the United States that they have not played

a role in crime reduction for many years2.  See Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia

Bowling, *What caused the Crime Decline*?, Brennan Center for Justice, at 7 (February 26, 2015)

(hereinafter "*Brennan Report*") ("the current exorbitant level of incarceration has reached a point

where diminishing returns have rendered the crime reduction effect of incarceration so small, it

has become nil").  Synthesizing data from the past few decades with recently collected data, the

*Brennan Report* determined that "incarceration has been decreasing as a crime fighting tactic

since at least 1980…[and s]ince approximately 1990, the effectiveness of increased incarceration

on     bringing     down     crime     has     been     essentially     zero."     *Id.*     at     23.

**Table 2: Crime and Incarceration Rates (1990-2013)**

| | 1990-2013 | 1990-1999 ("1990s") | 2000-2013 ("2000s") |
|---|---|---|---|
| **Violent Crime** (murder, non-negligent manslaughter, forcible rape, robbery, aggravated assault) | 50% decline | 28% decline | 27% decline |
| **Property Crime** (burglary, larceny-theft, motor vehicle theft) | 46% decline | 26% decline | 25% decline |
| **Imprisonment** | 61% increase | 61% increase | 1% increase |

*Sources: Federal Bureau of Investigation, Uniform Crime Reports; U.S. Department of Justice, Bureau of Justice Statistics.*[13]

*Id.*

This lack of correlation between crime reduction and heightened incarceration rates is

apparent from the simultaneous declines in state prison populations and crime rates in those

states.  *See Brennan Report*, at 27 (imprisonment and crime decreased by more than 15% in New

Yokr, California, Maryland, New Jersey, and Texas, which account for "more than 30 percent of

the US population").  The *Brennan Report* cites the overestimation of the deterrent effect of

heavy penalties as one possible factor in the ineffectiveness of incarceration as a crime reduction

---

2 Portions of this section and statistical sentencing information were taken from materials prepared by Joshua Dratel, Esq.

tool.  *See Id.* at 26 (relying in part on the National Academy of Sciences report that concluded "insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects").





*Source: Federal Bureau of Investigation, Uniform Crime Reports; U.S. Department of Justice, Bureau of Justice Statics.*[22]

*Id.*

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Deputy Attorney General James M. Cole spoke at the New York City Bar Association last year.  While much of his message involved the movement to smarter sentencing for drug offenses, he also focused on the "crushing prison population."  He Said:

> While the United States comprises only five percent of the world's population, we incarcerate almost a quarter of the world's prisoners.  And while the entire U.S. population has increased by about one-third over the last thirty years, the federal prison population has increased at a staggering rate of 800 percent—currently totaling nearly 216,000 inmates.  It currently operates at 33 percent over capacity system-wide, and in the high security prisons the overcrowding rate is even higher.  We have a greater percentage of our population in prison than any other industrialized country, and the cost to maintain this is unsustainable.



This is an ongoing issue and has led to the introduction of at least two new proposed bills seeking to reduce the prison population, and revisions to the Sentencing Guidelines. Importantly, the United States Sentencing Commission recently adjusted the victim enhancement under 2B1.1.

For Mr. Yucel, a sentence of 30 months would specifically deter him from any further criminal conduct.  He has endured significant hardships during his extradition and pretrial

detention, and has learned that the United States means business in relation to its' law enforcement activities.  The specific deterrence afforded by a prison term of any length is likely to dissuade Mr. Yucel from further criminal activity.

Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. *Id.* Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.  *Id.*

In this instance, the confinement conditions and the loss of family and community support are relevant concerns.  Mr. Yucel, a Swedish national, has been held at MCC New York for over a year.   In determining the proper sentence, the Court should consider that the circumstances of confinement have been more onerous than a typical defendant.  While waiting for extradition in Moldova, Mr. Yucel was imprisoned for a brief period of time between May 21, 2014 and his arrival in the United States of May 26, 2014.  The night of his removal from Moldova, Mr. Yucel was forcefully removed from his prison cell by unknown men, a hood placed over his head, and taken to an airport location where he was loaded onto a plane and made to travel in handcuffs.  Obviously, this experience was traumatic for Mr. Yucel, and not typical for most people charged with crimes, especially non-violent offenses.

Moreover, Mr. Yucel is incarcerated in a foreign country where he does not know anyone, and where his family and friends cannot visit him.  He has spent the last year alone, away from loved ones.  The isolation has aggravated his increased his anxiety.  Compounding the loneliness, separation, anxiety, and fear caused by being separated from everything he knows by thousands of miles, MCC is a notoriously unpleasant facility. The harsh conditions of MCC – including lack of programming and lack of exposure to sunlight and the outside – are well known.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979); *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).

Courts have determined that the conditions of pre-trial detention may serve as a basis for variance.   See *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure"); *United States v. Mendola*, 03-CR-449 (S.D.N.Y. 2005) (KMW) (reducing sentence by one-third of time spent in MCC because of poor and unsanitary conditions, overcrowding, inadequate bathroom facilities, inadequate medical attention and concluding that "under Section 3553, some lowering of what otherwise be his sentence is appropriate"); *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (RPP) (departing downward based on defendant's thirteen and one-half month pretrial detention at facility where he suffered physical and psychological trauma including restricted family visits "under qualitatively different conditions that those of pre-sentence detainees in federal facilities"); *United States v. Behr*, 2006 U.S. Dist. LEXIS 38349, at *12-13 (S.D.N.Y. June 14, 2006) (RWS) (sentencing defendant to time served after pre-trial incarceration at MCC where conditions were overcrowded, unsanitary, and lacked certain facilities, and rose to the level of punitive rather that administrative confinement);   United States v. Alvarez Castellanos, 2006 U.S. Dist. LEXIS 76784, at *9-12

(RWS), 2006 WL 3016313 (S.D.N.Y. Oct. 23, 2006) (discussing conditions abroad and beatings by guards endured by defendant); United States v. Trochtchenkova, 05 Cr. 503 (SAS) (Oct. 11, 2006) (departing where defendant had no family in the United States).

The conditions of Mr. Yucel's pre-trial confinement combined with his separation from his family, community, and social support create an extraordinary punishment that the guidelines do not account for.  These factors warrant a downward variance.

Further, Mr. Yucel's immigration status alone prevents him from being designated to a prison camp or low security facility.  Likewise, Mr. Yucel may be ineligible for a number of BOP programs that might otherwise provide Mr. Yucel an avenue to make his incarceration more productive and manageable.

Mr. Yucel is 25 years old, a first offender, employed during adult life, educated, is engaged to be married, and has no history of drug or alcohol abuse. For all male offenders in Criminal History Category I recidivism rates 15.2%.  For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Mr. Yucel who have been employed, are educated and are drug free the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*].  Finally, offenders like Mr. Yucel with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*].

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"). The Commission has not implemented any such revisions to the criminal history guidelines, but has stated that they "may be relevant." USSG § 5H1.1, p.s.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Yucel, this Court should consider the statistically low risk of recidivism presented by Mr. Yucel's history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

A lengthy jail sentence is counter-productive in this particular instance. The Court should be mindful of the significant loss Mr. Yucel faces if sentenced to a lengthy term in prison.

Mr. Yucel has never been imprisoned.  A sentence of 30 months would satisfy the punitive nature of sentencing in this case, and will adequately deter Mr. Yucel, and white-collar criminals generally from further criminal conduct.

In Fact, according to "the best available evidence" imprisonment does not "reduce recidivism more than non-custodial sanctions."  Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) *See also* Gary Kleck, et. al. *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

Justice Kennedy concurred during Congressional testimony recently, as *The Wall Street Journal* reported that, "in many instances, [Justice Kennedy] said, it would be wiser to assign offenders to probation and other supervised release programs."  Jess Bravin, "Two Supreme Court Justices Say Criminal Justice System Isn't Working," *The Wall Street Journal*, March 14, 2015, available at http://www.wsj.com/article_email/tow-supreme -court-justices-say-criminal-justice-system-isnt-working-1427197613-1MyQjAxMTA1NTIzNDUyNTQyWj.

Justice Kennedy added, "This is cost-effective,' he said, even 'without reference to the human factor' involved in incarceration.  'We have very low recidivism rate for those who are on release.'"  *Id.*  In this instance, Mr. Yucel has already faced a period of incarceration, and faces additional incarceration.  However, the points made by Justice Kennedy paint the backdrop for the question of what length of sentence is sufficient but is not unnecessary for the purposes of sentencing.

The fact that Mr. Yucel was convicted of a white-collar, non-violent offense supports the proposition that a short definite sentence is sufficient to deter him and other from any future

misconduct.  *See U.S. v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ("considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders").

This Court, after considering the need to deter Mr. Yucel through specific deterrence and others similarly situated individuals through general deterrence, should find that a sentence of 30 months is sufficient, but not greater than necessary based on the need to provide adequate deterrence.

### (C) to protect the public from further crimes of the defendant

Todd A. Bussert, a private attorney with the Law Office of Todd A. Bussert, at a Symposium on Alternatives to Incarceration held by the United States Sentencing Commission.

> The *State of the Bureau*, the BOP's publication, 18.5 percent of its population in 2006 is in minimum security, 39.6 percent low security. These are the types of low-risk, moderate-risk offenders that all these state officials have been coming in and talking about, advocating short periods of confinement, intensive services, and get them back into the community because the longer they stay in, the more likely they are to recidivate. These are the people we're talking about. I'm not talking about offense types, or in terms of the drugs, or what have you, but just looking at the individuals. The BOP has a risk assessment tool. They think these people are relatively low risk. So 18.5 percent of the people can walk out of a prison camp any time and walk into your community, but by and large they don't, and these are people that I would argue—probably 90 percent—who could be returned to the communities tomorrow, and there's going to be no difference in public safety.

Proceedings from the Symposium on Alternatives to Incarceration (July 14-15, 2008) at 396, *available at* http://www.ussc.gov/SYMPO2008/ Material/19_FINAL_AlternativesinGLs.pdf, (emphasis added).  This suggests that Mr. Yucel, clearly a low risk offender, is an appropriate candidate for a short term of incarceration.

According to a June 2012 study by the Pew Center on the States, entitled *Time Served –
The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*), which analyzed
state data reported to the federal government between 1990 and 2009, "offenders released in
2009 served an average of almost three years in custody, nine months or 36 percent longer than
offenders released in 1990.  The cost of that extra nine months totals and average of $23,300 per
offender." *Id.* at  2, available at http://www.pewstates.org.uploadedFiles/PCS_Assets/2012/
Prison_Time_Served.pdf.

Also, the *Pew Report* found that "for offenders released in 2009 after serving prison
sentences for drug crimes: 2.2 years in prison, up from 1.6 years in 1990 (a 36%increase)."  *Id*. at
3.  Nor, with respect to many offenders, was there a correlation between the longer imprisonment
and improved public safety.  As the *Pew Report* concluded:

> [d]espite the strong pattern of increasing length of stay, the
> relationship between time served in prison and public safety has
> proven to be complicated.  For a substantial number of offenders,
> there is little or no evidence that keeping them locked up longer
> prevents additional crime.

*Id*. at 4.  *See also Id*. ("[a] new Pew analysis conducted by external researchers using data from
three states –Florida, Maryland and Michigan – found that a significant proportion of nonviolent
offenders who were released in 2004 could have served shorter prison terms without impacting
public safety").

Mr. Yucel would be devastated by a 70 month term of imprisonment.  A lengthy term of
imprisonment is not needed to protect the public from further crimes of Mr. Yucel.  The
redeemable qualities inherent in white collar offenders - Mr. Yucel particularly - the minute

chance of recidivism and the punitive nature of a short but definite sentence all lead to the conclusion that Mr. Yucel will not break the law in the future and is no danger to the community.

### (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Mr. Yucel is educated, has marketable professional skills, does not use drugs or alcohol, and is in good physical health. Therefore, Mr. Yucel is not in need of any educational, vocational, medical, or drug treatment that may be offered through the Bureau of Prisons. Mr. Yucel is interested in returning to school, but his education level is above that for which the BOP could provide meaningful assistance. A term of imprisonment would not provide Mr. Yucel with any needed treatment. Thus, imprisonment would be counter-productive by taking Mr. Yucel's ability to earn a living wage.

### 3. The Kinds of Sentences Available

In *Booker*, the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker,* 125 S. Ct. at 756. This renders the sentencing guidelines advisory. *Id.*

The offense for which Mr. Yucel plead is a Class C felony. 18 U.S.C. §3559(a)(3). Because this offense is a Class C felony, Mr. Yucel may be sentenced to a full range of alternatives to incarceration including straight probation.

### 4. The Sentencing Range Established by the Sentencing Commission

The Probation Officer has calculated an advisory guideline range of 70-87 months. The Plea Agreement also calls for an advisory range of 70-87 months. We agree with the calculation. However, as a practical matter, the guideline range offers little useful advice because it fails to take any account of Mr. Yucel's low risk of recidivism, personal history and circumstances, or

collateral punishment and is far greater than necessary to promote the goals of sentencing in this case.

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").

In looking at the guidelines currently in effect, the Court should be mindful that the Sentencing Commission has passed a number of amendments to the guidelines. Those amendments do not become effective until November 1, 2015, thus a downward departure based on those guidelines is not warranted. However, the changes to the guidelines, which would impact Mr. Yucel's advisory guideline range are important considerations in the context of a downward variance. The Sentencing Commission enacted the following changes to 2B1.1 involving the victim enhancement under 2B1.1(b)(2):

(2)    (Apply the greatest) If the offense—

    (A)    (i) involved 10 or more victims; or (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by **2** levels;

26

    (B)    involved 50 or more victims resulted in substantial financial hardship to five or more victims, increase by **4** levels; or

    (C)    involved 250 or more victims resulted in substantial financial hardship to 25 or more victims, increase by **6** levels.

As a result, the 6 point enhancement contained in the PSR pursuant to 2B1.1(b)(2)(c) because the offense involved more than 250 victims, would be reduced to a 2 point enhancement under the newly adopted guidelines.  If Mr. Yucel's sentencing were on or after November 1, 2015, he would be facing an advisory guideline range of 30-57 months based on a total offense level of 23, and a Criminal History Category of I.  Injustice would be served if this substantial change to the guidelines were not accounted for at sentencing due simply to the timing of Mr. Yucel's sentence and for no other reason.

**5.    The Need To Avoid Unwarranted Disparities**

The United States Sentencing Commission (hereinafter "the Sentencing Commission") published each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report* (hereinafter "*Quarterly Data Report 2014*")[3]. The figures in the *4th Quarter Release, Preliminary Fiscal Year 2014 Data, Through September 30, 2014*, which covers sentences imposed from October 1, 2013, through September 30, 2014,

---

3 The Quarterly Data Report is available at: http://www.uccc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-4th-Quarterly-Report.pdf.

demonstrate that the guidelines no longer constitute the predominant factor in a decisive majority of sentences in the Southern District of New York (or the Eastern District of New York, either).

For example, the *Quarterly Data Report* reveals that in Fiscal Year 2014 within the Second Circuit, a clear majority of sentences, 69.6%, were *not* within the calculated guideline range. *See Quarterly Data Report 2014* at 2. In SDNY, 73.1% of sentences were outside the guideline range (along with 74.5% in EDNY). *Id.* Those numbers represent a continuing trend since *Booker* was decided January 12, 2005: in the first quarter of 2005, 70.5% of sentences nationally were within the guideline range. *Sourcebook of Federal Sentencing Statistics,* U.S. Sentencing Commission, Section 2, Fig. G & Section 3, Fig. G (2005). That number initially decreased to 61.8% by the first quarter of 2006, then remained essentially steady (60.7% in first quarter 2007, and 60.0% for first quarter 2008), before resuming its decline in 2009 and thereafter. *Id.*

In addition, only a minute fraction – 1.5% - of all SDNY sentences were above the guideline range, while 71.7% were *below* the range. In addition, the reasons for the sentences below the guidelines have evolved as well. In SDNY during Fiscal Year 2014 only 20.9% of sentences were attributable to government-sponsored motions, while 3353(a) factors, downward departures, and/or a combination thereof were responsible for 50.8% of sentences (all of which were below the guideline range). *Quarterly Data Report* 2014 at 3.

The proportion of sentences in SDNY in Fiscal Year 2014 below the guidelines, and attributable exclusively to "below range w/ *Booker* - 45.1% - represents, by a wide margin, the highest percentage in that category among all districts.

The proportion of sentences within the applicable advisory guideline range continue to decline. Thus for the First Quarter of FY 2015, within the Second Circuit, 72.1% of sentences

were outside the guideline range, with 71.6% *below* the range and 0.5% above the range.  *See Preliminary Quarterly Data Report*, 1st Quarter Release, Preliminary Fiscal Year 2015 Data October 1, 2014, Through December 31, 2014.

In SDNY, the numbers are even more dramatic, as 77.1% of sentences were outside the range, with more than three-quarters of all sentences imposed during this period were below the range at 76.4%.  *Id*.  21.7% of those below range sentences were attributable to government-sponsored downward departures.  However, 54.6% of the below range sentences were without the support of and government request.  *Id*.

Going further, a majority of sentences in SDNY during first quarter FY 2015 – 50.9% - were, for the first time, below the guideline range based on *Booker* alone.  *Id* at 3.  Thus, in SDNY a sentence *below* the guideline range is the overriding norm, not the exception.  Even excluding cases involving 5K1.1 or other government-sponsored motions, the incidence in SDNY of a below guideline sentence based on 3553(a) factors and/or downward departures (50.8% of all sentences for FY 2014; 54.6% for 1st Quarter 2015) was nearly double the number of within guideline sentences (26.9% for all sentences in 2014; 22.9% for 1st Quarter FY 2015).

The mean sentence for all offenders within the "fraud" category in 2014 was 27 months while the median sentence was 14 months.  *Quarterly Data Report 2015.*  The 1,732 fraud offenders who received a non-government sponsored variance to a below guideline range sentence the average decrease was approximately 51.4% from the guideline minimum.  *Id*.

Mr. Yucel must be sentenced based on the individual factors presented to this Court.  The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways

not accounted for in the guideline range. *See Gall v. United States*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated").

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 30 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.

Thus, any support for a guidelines sentence pursuant to the applicable advisory range for Mr. Yucel in this case not only ignores the 3553(a) factors, other than the guidelines themselves, but also defies empirical reality in SDNY and the Second Circuit.   "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance," *United States v. Parris*, 573 F. Supp. 2d 744, 751 (EDNY 2008); *see also United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (The **"**Guidelines were of no help.").

A variance is necessary to do justice in this case, and will also contribute to the evolution of responsible guidelines. As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw." *Rita*, 551 U.S. at 357-58.

**6.      The Need To Provide Restitution To Any Victims of the Offense**

Restitution is not sought in this case.

## SUMMARY OF THE LAW

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 306 (2000) applies to the Federal Sentencing Guidelines. *United States v. Booker*, 125 S. Ct. 738, 756 (2005). Given the mandatory nature of the Sentencing Guidelines, the Court found "no relevant distinction between the sentence imposed pursuant to the Washington statutes in *Blakely* and the sentences imposed pursuant to the Federal Sentencing Guidelines" in the cases before the Court. Id. at 751.  Accordingly, reaffirming its holding in <u>Apprendi</u>, the Court concluded that

> [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

<u>Id.</u> at 756.[4][1]

Based on this conclusion, the Court further found those provisions of the Federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1) or which rely upon the Guidelines' mandatory nature, 18 U.S.C. § 3742(e), incompatible with its

Sixth Amendment holding. *Booker*, 125 S. Ct. at 756. Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." *Id.* at 757.

Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a). *Booker*, 125 S. Ct. at 757. Thus, under *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

> 1) "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1);
> 2) "the kinds of sentences available" (§ 3553(a)(3);
> 3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6); and
> 4) "the need to provide restitution to any victims of the offense." (§ 3553(a)(7).

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section

3553(a) factors, the judge is required to "recogniz[e] that imprisonment is **_not_** an appropriate means of promoting correction and rehabilitation" (emphasis added).

Under 18 U.S.C. § 3661, "**_no limitation_** shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth.   *See* U.S.S.G. § 5H1. The directives of *Booker* and § 3553(a) make clear that courts may no longer uncritically apply the guidelines.   Such an approach would be "inconsistent with the holdings of the merits majority in *Booker*, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, directing courts to consider all of the §3353(a) factors, many of which the guidelines either reject or ignore."   *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.).   As another district court judge has correctly observed, any approach which automatically gives "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, __ F. Supp. 2d __, 2005 WL 605787 *4 (D. Mass. March 16, 2005) (Gertner, J.).   *See also United States v. Ameline*, 400 F.3d 630, 655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), *reh'g en banc granted*, 401 F.3d 1007 (9th Cir. 2005).

Justice Scalia explains the point well in his dissent from *Booker's* remedial holding:

> Thus, logic compels the conclusion that the sentencing
> judge, after considering the recited factors (including the

> guidelines), has full discretion, as full as what he possessed
> before the Act was passed, to sentence anywhere within the
> statutory range.  If the majority thought otherwise if it
> thought the Guidelines not only had to be 'considered' (as
> the amputated statute requires) but had generally to be
> followed its opinion would surely say so.

*Booker*, 125 S. Ct. at 791 (Scalia, J., dissenting in part).  Likewise, if the remedial majority thought the guidelines had to be given "heavy weight," its opinion would have said so.  The remedial majority clearly understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider **all** of the § 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  And where the guidelines conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

## <u>Conclusion</u>

For the foregoing reasons, Mr. Yucel respectfully requests that this Court sentence him to 30 months imprisonment.  Such a sentence properly accounts for the factors found in 18 U.S.C. 3553(a) and is sufficient, but not greater than necessary to meet the statutory goals of sentencing.

Respectfully submitted this 5th Day of June, 2015.

s/ Bradley L. Henry
Attorney for Alex Yucel
261 Madison Avenue
12th Floor

New York, NY 10016
(212) 736-3900
Bhenry@blanchpc.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on June 5, 2015, a copy of the foregoing document was filed via the EM/ECF system.  Notice will be sent to all registered users.

<u>s/ Bradley L. Henry</u>